**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 20-218 |
| ANTONIO EGURROLA-GAMBOA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Presently before the Court is the Government's motion pursuant to 18 U.S.C. § 3145(a)(1) seeking revocation of a release order issued by United States Magistrate Judge Barbara A. McAuliffe in the Eastern District of California, which is opposed by Defendant Antonio Egurrola-Gamboa.  (*See* Docket Nos. 150, 212, 234, 251).  After careful consideration of the parties' positions, review of the detention hearing transcript, the referenced Pretrial Services Report and additional evidence submitted by the parties at the hearing held on November 16, 2020, (Docket Nos. 258, 370, 370-2 – 370-8), the Government's motion will be granted and detention will be ordered.  In addition to the reasons stated on the record at the November 16th hearing, the following includes the Court's findings of fact and additional statement of the reasons for detention as required by 18 U.S.C. § 3142(i)(1).

## I.   BACKGROUND

### A.   PROCEDURAL HISTORY

On August 25, 2020, Defendant and 26 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and

around October 2018 until in and around June 2020.  (Docket No. 3).  An arrest warrant was issued for Defendant on that same date.  (Docket No. 16).

As outlined in the Government's motion, Defendant was arrested in the Eastern District of California on September 2, 2020, he had an initial appearance there and was ordered to be detained pending a detention hearing.  (Docket No. 150 at 2).  Following a detention hearing held on September 9 and 10, 2020,  Magistrate Judge McAuliffe entered an order releasing Defendant on a $28,000 collateral bond secured by the posting of the title to his mother's vehicle, a 2016 Freightliner Cascadia, requiring that he reside with two third-party custodians and other conditions.  (Docket Nos. 258-2 at 10-12).  At the Government's request, Magistrate Judge McAuliffe stayed the release order for 48 hours to permit the Government to file a motion for revocation.  (*Id.* at 20).

On September 11, 2020, the Government filed with this Court an emergency motion for a stay and revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1).  (Docket No. 150).  In sum, the Government represented that Defendant "is subject to a rebuttable presumption in favor of detention.  He is unable to rebut it.  The charges against him are serious, his involvement in the conspiracy was significant, and the weight of the evidence is strong.  Defendant's drug-trafficking activity represents his only tie to the Pittsburgh area, where this case is pending.  [Defendant's] release would pose a serious danger to the community.  It would also give rise to an intolerable risk of flight, which could be aided by several conspirators who have thus far managed to evade law enforcement." (*Id.* at 11).  On that same date, this Court granted the Government's motion as to its request that the release order be stayed and further ordered that Defendant shall remain in the custody of the United States Marshals Service and be transported forthwith to the Western

District of Pennsylvania for further proceedings on the Government's request that he be detained pending trial or other disposition.  (Docket No. 151).

On September 25, 2020, Defendant filed a motion to lift the stay of the release order pending this Court's disposition of the Government's appeal.[1]  (Docket No. 212).   The Government filed a response on October 2, 2020 and Defendant filed a reply on October 9, 2020. (Docket Nos. 234, 251).  In sum, Defendant contends that he has none of the characteristics or background that would support a finding that he is a flight risk or a danger to the community, thus he should be released on conditions as Magistrate Judge McAuliffe concluded.  (Docket No. 251 at 5).   Conversely, the Government argues that Defendant play an integral role in the drug trafficking organization ("DTO"), as he was responsible for transporting its financial proceeds and multi-kilogram quantities of cocaine.  (Docket No. 234 at 7).  Given Defendant's drug trafficking activity, the substantial penalty he faces if convicted and his lack of ties to this District, "there [is] nothing to stop him from fleeing -  most likely to Mexico, where he routinely travels."  (*Id.* at 7-8).   According to the Government, detention is therefore warranted to assure Defendant's appearance and the safety of the community.  (*Id.* at 8).

The Court subsequently held telephone conferences with counsel on October 13 and 20, 2020 to facilitate the scheduling of this matter.  After consultation with the United States Marshals Service, the Court learned that Defendant's transport to this District had not yet occurred due to logistical matters presented by the COVID-19 pandemic.  At that time, Defendant remained incarcerated at a facility in Bakersfield, California, and arrangements initially were made with that facility to conduct a hearing on October 30, 2020.  (Docket No. 279)  Due to a personal matter,

---

1       Given the Court's ruling detailed herein, Defendant's motion to lift the stay of the release order is denied as moot.

Government counsel moved for a brief continuance, to which defense counsel consented, and the hearing was rescheduled to occur on November 3, 2020.  (Docket Nos. 286, 287).

On October 30, 2020, the Court was advised by the Marshals Service that Defendant had been placed on an airlift that day for transport to this District, and was further advised on November 2, 2020, that Defendant was housed at a facility in Oklahoma with a possible arrival in Pittsburgh scheduled for the following week.  (Docket No. 330).  As such, the Court entered an order cancelling the hearing on November 3, 2020 and indicating that it would be rescheduled as expeditiously as possible upon Defendant's arrival in this District.  (*Id.*).

On November 11, 2020, Defendant's counsel advised the Court's staff via email that he was presently housed at a facility in Grady County, Oklahoma and his sister reported that he had contracted COVID.  The Court inquired with the Marshal's Service, which confirmed Defendant's counsel's report and conveyed that he had tested positive for COVID on November 9th and was receiving appropriate medical treatment.  The Marshal's Service further advised that the facility in Oklahoma could facilitate a video hearing which the Court scheduled and held on November 16, 2020.  (Docket Nos. 360, 370).

B. **EVIDENCE ADDUCED AT THE HEARING**[2]

At the November 16th hearing, the Government relied on the testimony of Drug Enforcement Administration Special Agent ("SA") Michael Johns, who is one of the lead agents in the investigation of this case.[3]  SA Johns' testimony was based on his personal knowledge,

---

2       An official transcript of the hearing has not been produced as of this date.  Therefore, the Court summarizes the testimony presented from its notes of the proceeding and by reference to an unofficial draft of the transcript.

3       SA Johns testified that during his career with the DEA which began in 2002, he has participated in investigations ranging from street-level drug dealing to high level narcotics trafficking, as well as Title III wiretap investigations, and he is familiar with communication modes and methods utilized by DTOs.  In this Court's estimation, SA Johns presented as an experienced agent and, based on his demeanor and testimony in response to the questioning of the attorneys, he offered credible testimony concerning the investigation of this case.

including his review of Title III wiretap intercepts, and information relayed to him by other investigating agents. SA Johns explained that the investigation focused on the trafficking of cocaine from Mexico into the United States, including Pennsylvania, Los Angeles, California and Tucson, Arizona. Relevant here, co-defendant Jamaal Maragh was identified as the main operative for the DTO in Pittsburgh. Maragh's telephones, including Target Telephone #1 ("TT #1"), were the subject of Title III wiretaps between November 2019 and June 2020. During that time, agents intercepted communications between TT#1 and 520-470-8966. Agents identified Defendant (also referred to as Chango) as the user of that telephone by using geolocation information and physical surveillance in conjunction with intercepted communications and his driver's license.

Through SA Johns' testimony, the Government entered into evidence Exhibits 1, 2 and 3, which are transcriptions of a series of intercepted telephone calls between various co-conspirators in this case.[4] (*See* Docket Nos. 370-2, 370-3, 370-4). According to SA Johns, Exhibits 1, 2 and are fair and accurate transcriptions of the calls.

SA Johns testified that Government's Exhibit 1 is a transcription of calls intercepted over TT #1. In February 2020, Maragh and an unknown male discussed arrangements to ship approximately 35 kilograms of cocaine to Pittsburgh using a tractor-trailer. In a later call involving discussion of a meeting location, Defendant told Maragh that another truck driver would be delivering the shipment of cocaine. Defendant further indicated that the driver would be in a semi-

---

[4]      The Court admitted Government's Exhibits 1, 2 and 3 over Defendant's objection that the transcriptions are not the best evidence of the intercepted telephone calls. The Court again observes that the transcriptions are properly considered for present purposes because the Rules of Evidence do not apply at detention hearings. *See* 18 U.S.C. § 3142(f)(2) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *United States v. Chagra*, 850 F. Supp. 354, 358 n.3 (W.D. Pa. 1994) (citing 18 U.S.C. § 3142(f) (although agent's testimony regarding information received from confidential informants and cooperating witnesses was hearsay, it was properly considered at hearing on Government's motion to revoke release order because the rules concerning admissibility of evidence in criminal trials do not apply to detention hearings).

truck and Maragh explained that a blue Hyundai Sonata would arrive to pick up the 35 kilograms of cocaine. Subsequently, agents conducting surveillance at a Speedway gas station in McKees Rocks, Pennsylvania observed a semi-truck and a blue Hyundai Sonata operated by co-defendant Sherita James, as well as a BMW driven by Maragh. Agents observed the Sonata back up to the white tractor-trailer, a then-unknown male removed a suitcase from the truck's cab, placed it in the trunk of the Sonata and the Sonata left the area. Later, Maragh indicated in an intercepted call with an unknown male that he had taken possession of the 35 kilograms of cocaine and secured it at a stash location. There was also discussion about Maragh giving the unknown male $100,000 - $200,000. After that, Maragh called Defendant and told him to tell the truck driver who was in Pittsburgh that Maragh had $240,000 in drug proceeds for him to pick up and would meet him at the Speedway gas station. Agents surveilling the area saw the blue Sonata return to the Speedway and observed that a bag was transferred from the vehicle to the driver of the same white tractor-trailer. After the tractor-trailer departed, it was later stopped on Interstate 79 and the driver was identified as co-defendant Justo Parra.

SA Johns next explained that Government's Exhibit 2 begins with a transcription of a call on February 26, 2020 between Defendant and co-defendant Manuel Silvestre, whose telephone was the subject of Title III wiretaps during the investigation. Silvestre was located in Los Angeles and received deliveries of kilogram quantities of cocaine, arranged for its further distribution and collected drug proceeds. Defendant and Silvestre discussed a meeting location at a truck wash during which another individual would deliver cocaine to Silvestre. In a subsequent call, Silvestre and an unknown male discussed that this delivery would involve 16 kilograms of cocaine. Agents conducting surveillance on February 27th at a truck wash in Los Angeles observed the same white tractor-trailer which previously had been in Pittsburgh and determined that Defendant was its

registered owner.  Agents also observed a vehicle driven by Silvestre pull up to the tractor-trailer, and saw the truck driver, identified as Parra, exit the cab, roll a suitcase to Silvestre's vehicle, place it inside, and then Silvestre departed the area.

As SA Johns recounted, Government's Exhibit 3 begins with an intercepted call on March 5, 2020, during which Maragh told an unknown male that he was going to give the unknown male $690,000 in drug proceeds.  In intercepted calls between Defendant and Maragh which followed, Defendant indicated that he was the truck driver who would be present at the Speedway gas station in McKees Rocks on this occasion, and Maragh instructed him to meet with the same blue Hyundai Sonata.  Surveilling agents reviewed camera footage of the Speedway, which showed a blue Sonata parked in front of a white tractor-trailer.  Defendant exited the tractor-trailer, retrieved two duffle bags from the Sonata and placed them in the cab of the tractor-trailer.  SA Johns testified that intercepted communications indicated to him that the duffle bags contained $690,000 in drug proceeds.

Finally, SA Johns testified that Agent Brianna Coleman of the United States Department of Homeland Security provided him with a record of Defendant's inbound travel from Mexico to the United States compiled by her agency, which was admitted as Government's Exhibit 4.[5]  (*See* Docket No. 370-5).

Defendant proffered evidence at the hearing consisting of background information from the Pretrial Services Report indicating that he is a life-long resident of Tucson, Arizona where he lived with his mother and sister, and he has a young daughter who lives with his ex-wife in Mexico.

---

5       Given that SA Johns did not prepare Government's Exhibit 4, Defendant objected to its admission for the purpose of any interpretation beyond the data points reflected on the document.  The Government did not ask SA Johns to interpret the document, and the Court admitted Exhibit 4 for the purpose of the information represented thereon; that is, Defendant's inbound travel from Mexico to the United States for the time period listed.

Defendant previously was employed as a licensed commercial truck driver and his work will continue if he is released as shown by a letter from his employer.  (*See* Docket No. 370-6). Defendant also proffered the testimony of his sister, Carolina Gamboa, describing him as respectful of others, hardworking and responsible.  To that end, Defendant contributed financially and assisted with household chores when he previously resided with his mother and sister.  Ms. Gamboa indicated that she is willing to serve as a third-party custodian for Defendant. Additionally, Defendant entered into evidence court records from a prior criminal case in Pima County, Arizona which demonstrate that he attended all court proceedings as required, (*see* Docket Nos. 370-7, 370-8), and he proffered the testimony of Attorney Peter Keller, who represented him in that case, confirming that he did not have any attendance issues.

After reviewing the transcript of the detention hearing before Magistrate Judge McAuliffe, considering the Pretrial Services Report, the supplemental information and evidence presented at the hearing and the arguments of counsel, and for reasons stated at the hearing and further detailed here, the Court concludes that there is no condition or combination of conditions which will reasonably assure Defendant's appearance as required and the safety of the community if he is released.

## II.   LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings.  Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ."  A district court exercises

*de novo* review over a release order entered by a magistrate judge.[6]  *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).   A district court may incorporate the transcript of the proceedings before the magistrate judge, as this Court did at the November 16th hearing.  *See Chagra*, 850 F. Supp. at 357.  The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it has done here.[7]  *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. §3142(b).  Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered.  18 U.S.C. §3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of

---

6       Although the Court held a hearing in this case, it is well-established that "[d]e novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing."  *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.").

7       As noted, the Court has considered the Pretrial Services Report prepared in the Eastern District of California. Neither party has objected to the contents of this Report, other than Defendant's disagreement with the recommendation of the Pretrial Services Office that there is no condition or combination of conditions that can be fashioned to reasonably assure his appearance and thus he should be detained pending trial or other disposition of this matter.

terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3). This rebuttable presumption applies, among others, to cases in which there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A). An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . . that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). The defendant's burden of production is relatively light and has

been construed as easy to meet.[8]  *Chagra*, 850 F. Supp. at 357 (citation omitted).  If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *Id.* at 358 (citation omitted).  If the defendant rebuts the presumption, the burden of persuasion remains with the Government.  *Id.* at 357.  Thus, the Government bears the burden of proving that the defendant presents either a risk of flight or a danger to the community.[9]

## III.    **DISCUSSION**

As an initial matter, Defendant is charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which carries a penalty of not less than ten years and up to life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(ii). This charge raises the rebuttable presumption that no condition or combination of conditions will reasonably assure Defendant's appearance and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).  Defendant does not dispute that the rebuttable presumption applies in this case.

Defendant attempts to rebut this presumption by proffering evidence that he is a life-long resident of Tucson, Arizona who was employed as a licensed commercial truck driver prior to his arrest in this case and his employment will continue if he is released.  (*See* Docket No. 370-6). Defendant also proffered the testimony of his sister, Ms. Gamboa, attesting to his good character, and Ms. Gamboa (and per the Pretrial Services Report, Defendant's mother) is willing to serve as

---

[8]    To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted).  This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'"  *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

[9]    The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that no condition or combination of conditions will assure his appearance at trial.  *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).  The Government must prove by clear and convincing evidence that he is a danger to the safety of any other person or the community.  *Delker*, 757 F.2d at 1399.

a third-party custodian for him. Defendant additionally introduced court records from a prior case in Pima County, Arizona showing that he attended all court proceedings and proffered the testimony of his prior counsel, Attorney Keller, confirming that Defendant appeared as required in his prior case. (*See* Docket Nos. 370-7, 370-8). Although Defendant admits that he "regularly" travels to Mexico, he posits that such travel for shopping, dining and vacationing is common for individuals who live near the border. (*See* Docket Nos. 212 at 4, ¶ 12; 251 at 4). Moreover, Defendant claims that he will not flee the United States because he "has no desire to forfeit his life as it has been with his mother, sister and family in Tucson." (Docket No. 251 at 5). Overall, Defendant submits that his background and characteristics demonstrate that he is not a danger to the community or a flight risk. (*Id.*).

As detailed in the Pretrial Services Report, Defendant reported making a monthly trip to Mexico to visit his daughter (beginning in March 2020 due to the COVID-19 pandemic) and bi-monthly trips to dine out for lunch. As noted, the Government introduced records compiled by the United States Department of Homeland Security which show Defendant's inbound travel to the United States from Mexico for the period from November 14, 2016 to August 31, 2020. (*See* Docket No. 370-5). According to those records, Defendant traveled from Mexico to the United States 23 times between August 27, 2018 and December 30, 2018, 73 times between January 4, 2019 and December 30, 2019, and 33 times between January 2, 2020 and August 31, 2020, or a total of 129 times in 2 years. (*See id.*). In this Court's estimation, 129 international trips in 2 years qualify as frequent international travel. While the Court accepts that individuals who live in close proximity to the border may travel to Mexico to shop, dine and vacation as Defendant notes, the Court agrees with others which have held that frequent international travel, in conjunction with

other relevant factors, supports a finding that an individual is a flight risk.[10]  *See e.g., United States v. Yusuf*, Crim. No. 4:19-CR-271-SDJ, 2020 WL 607105, at *6 (E.D. Tex. Feb. 7, 2020) (concluding the defendant was a flight risk because he represented his travel as infrequent but he had taken at least thirteen international trips in the past four years, which the court observed cannot be accurately described as "infrequent" travel "[b]y any metric"); *United States v. Ortiz*, Crim. No. 11-251-08, 2013 WL 247226, at *7 (E.D. Pa. Jan. 23, 2013) (concluding that a defendant charged with serious drug offenses who lived in Puerto Rico and traveled to Mexico on three separate occasions in the eighteen months preceding his arrest was a flight risk).

Even if Defendant's proffered information and evidence satisfies his burden to rebut the applicable presumption, the Court nonetheless concludes that the Government has  presented clear and convincing evidence that Defendant is a danger to the safety of the community and has proven by a preponderance of the evidence that he is a flight risk.  In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g).  For reasons that follow, the Court finds that the available information and proffered evidence on each of those factors weigh in favor of detention.

A.  **Nature and Circumstances of the Offense Charged**

The Government submits that this case arises from the investigation of a DTO which was responsible for distributing more than 100 kilograms of cocaine that was obtained from a source of supply in Mexico and sold by members of the organization in Pennsylvania, California, Arizona and other states.  (Docket No. 150 at 1).  For Defendant's part, he allegedly coordinated with other

---

10        Related to Defendant's travel and/or ties to Mexico, he states that his "ethnicity, implicit or explicit, should not be a consideration in determining whether he should be detained in this case."  (Docket No. 212 at 4, ¶ 12).  The record before the Court makes clear that the Government did not advance or in any way insinuate such an argument, and Defendant's ethnicity is wholly irrelevant to the detention analysis herein.  What is relevant, however, is that Defendant faces a serious charge which carries a substantial penalty, providing him strong motivation to flee as discussed in more detail below.  Those considerations, combined with Defendant's frequent international travel, family ties to Mexico, and absence of any ties to this District, cause this Court to conclude that he is a flight risk.

co-defendants to facilitate the delivery of significant kilogram quantities of cocaine and large sums of drug proceeds.  As a result of Defendant's alleged involvement, he has been indicted for a very serious controlled substance offense – that is, conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine.  (Docket No. 3).  If convicted, he faces a statutory mandatory term of not less than 10 years and up to life imprisonment.  In light of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

### B.  Weight of the Evidence

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the Indictment which establishes probable cause that the offense occurred.  More specifically, while Defendant is presumed innocent of the charged offense, the Government's evidence presented at the hearing strongly suggests that Defendant was not only involved in the conspiracy, but he played an important role in the DTO.

SA Johns testified that Title III wiretap intercepts and surveillance conducted during the investigation show the following: in February 2020, Defendant worked in conjunction with co-defendants Maragh and Parra to facilitate the delivery of 35 kilograms of cocaine to Pittsburgh and the receipt of $240,000 in drug proceeds; also in February 2020, Defendant coordinated with co-defendants Silvestre and Parra to effectuate the delivery of 16 kilograms of cocaine to Silvestre in Los Angeles; and Defendant coordinated with co-defendant Maragh to retrieve $690,000 in drug proceeds in the Pittsburgh area on March 5, 2020.  All told, the Government possesses substantial evidence of Defendant's involvement in the DTO, particularly as to the events of February and March 2020.  In sum, while recognizing that Defendant is presumed innocent of the charged offense, the weight of the evidence against Defendant favors pretrial detention.

14

### C.  **History and Characteristics of Defendant**

As to Defendant's background and characteristics, he is 32 years old, he was born and raised in Tucson, Arizona and lived in Tucson with his mother until he rented an apartment in Riverside, California from August 2019 until January 2020.[11]  From January until May 2020, Defendant rented a home in Tucson, but then moved back in with his mother and sister. Defendant's sister, who the Pretrial Services Officer spoke with to corroborate his background, was not aware that he rented a home earlier this year and claimed that he was living with her and her mother at the time.

Defendant has been married twice, most recently in October 2018, but he is in the midst of a divorce.  Defendant has a six-year old daughter from his second marriage.  Defendant's ex-wife and his daughter live in Mexico, and he travels there to visit her.  As detailed in the Pretrial Services Report, Defendant reported that he does not communicate with what he characterized as his small extended family in Mexico.  However, Defendant's sister advised that they have a large number of extended family in Mexico and communicate often through group text messages and visit each other on occasion during family reunions.

Although Defendant is in good physical and mental health,[12] he has a history of substance abuse.  Defendant reported that he began using marijuana at age 15 which continued on an infrequent basis until February 2020.  More troubling here, he also reported cocaine use beginning

---

11      Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are detailed in the Pretrial Services Report.

12      When the Pretrial Services Report was prepared, Defendant reported that he was in good physical condition. As noted, Defendant tested positive for COVID on November 9, 2020, which the Court has considered in conducting its analysis.  The Court notes that Defendant does not claim to have a pre-existing condition which would make him particularly susceptible to COVID-related complications and he apparently is receiving appropriate medical treatment. To that end, Defendant stated at the hearing that he is being given medication for COVID and he did not indicate experiencing any side effects from same.  Given all of this, while the Court recognizes Defendant's COVID diagnosis as a mitigating factor in assessing his history and characteristics, this does not outweigh all of the other factors the Court is required to consider as outlined herein.

at age 17 and continuing until March 2020 on a bi-monthly basis.  Given the nature of the offense Defendant is charged with in this case, it is concerning that he has used cocaine on a fairly regular basis since he was 17 years old and that Defendant's sister reported that she was unaware of his drug use.

To Defendant's credit, his criminal history is minimal.  According to the Pretrial Services Report, he was convicted of second-degree burglary in Pima County, Arizona in 2010 and was sentenced to 30 days' imprisonment and 3 years' probation.  A notation in connection with that conviction references failure to appear, but the Court accepts evidence submitted by Defendant indicating that he appeared as required for court proceedings in that case.  (*See* Docket Nos. 370-7; 370-8).

As noted, Defendant has worked full time as a commercial truck driver since 2017, and his employer indicated that his employment would continue if he is released.  (See Docket No. 370-6).  Although Defendant's solid employment history is commendable, it is troubling that he appears to have used his occupation in furtherance of a serious drug trafficking offense.

As to community ties, Defendant has no ties whatsoever to the Western District of Pennsylvania.  Although Defendant's mother, sister and some extended family live in Arizona, he also has family ties to Mexico, as his daughter, ex-wife and other extended family live there.  By his own admission, Defendant travels to Mexico several times per month to visit his daughter and to dine out, which the Court understands may be typical for those who live near the border, but the Government submitted evidence of Defendant's extensive international travel in the past two years.  (*See* Docket No. 370-5).  In this Court's estimation, Defendant presents a risk of flight, given that he is facing a substantial term of incarceration if convicted, he has no ties to this District, he has a history of frequent international travel and family ties Mexico.  *See e.g., Yusuf*, 2020 WL

16

607105, at *6 (defendant who had taken thirteen international trips in the past four years, which could not be accurately described as "infrequent" travel "[b]y any metric," was deemed to be a flight risk); *Ortiz*, 2013 WL 247226, at *7 (defendant who lived in Puerto Rico and traveled to Mexico on three separate occasions in the eighteen months preceding his arrest was a flight risk).

With regard to risk of flight, the Court recognizes that Defendant appeared as required for court proceedings in a prior case in Pima County, Arizona, but it is significant that the penalties he faces in the present case are far more severe.  In the prior case, Defendant was convicted of second-degree burglary and sentenced to 30 days' imprisonment and three years' probation.  In the present case, Defendant was allegedly involved in a DTO involving more than 100 kilograms of cocaine and large sums of drug proceeds and, at 32 years old, he is now exposed to a minimum of ten years' imprisonment.  In light of the nature of the charged conspiracy and the substantial penalty Defendant faces if convicted, this Court is not persuaded that any amount of bond or other means of personal supervision would deter him from fleeing.  *See Chagra*, 850 F. Supp. at 359-60 (given that the defendant faced minimum term of 20 years' imprisonment on drug conspiracy charge, the conspiracy involved large sums of cash, and evidence suggested that he had contacts in Mexico related to his illegal drug activities, the court was not satisfied that any possible conditions of release would reasonably assure the defendant's appearance, as "[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that the defendant is already fleeing").

The Court recognizes and appreciates that Defendant's sister and mother are amenable to serving as third-party custodians for him, but has serious concerns about such an arrangement, regardless of who would assume that role.  As detailed in the Pretrial Services Report, Defendant's sister appeared to be unaware of some important details about his life, such that he was renting a

Case 2:20-cr-00218-WSH   Document 375   Filed 11/20/20   Page 18 of 20

house in Tucson from January to May, 2020, and that he has used drugs, including cocaine, since he was 17 years old. Although Defendant's sister and mother are no doubt well-intentioned, the mere fact that they are willing to serve as a third-party custodian does not mean that they, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case.").

Overall, when considering Defendant's history and characteristics (most notably, no ties to the Western District of Pennsylvania, frequent international travel, family ties to Mexico and employment at an occupation which he utilized in furtherance of drug trafficking), this factor weighs in favor of pretrial detention. *See e.g., United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) (concluding defendant was a flight risk and revoking magistrate judge's release order, despite that defendant was a United States citizen, had no prior felony convictions, was described as a "dutiful employee" who held a job for five years, had ties to the community and agreed to post his home as security for the bond to secure his appearance, where he was indicted for serious drug conspiracy and weapons charges and had significant family ties to Mexico).

### D. <u>Nature and Seriousness of Danger to Any Person or the Community if Released</u>

The final factor requires consideration of the nature and seriousness of danger to any person or the community if Defendant is released. As to this factor, the Court recently explained in the case of one of Defendant's co-conspirators that:

[it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here. *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."). Distribution of Schedule II controlled substances like cocaine have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence." *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)). Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.

Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial." *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior."). The Court recognizes, as others have, that strict conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity. *See e.g., Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.").

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6, 2020).

These observations concerning the substantial risk of harm to the community posed by cocaine trafficking equally apply in Defendant's case. Based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of his continued drug trafficking activities. This risk is exacerbated given that Defendant plans to return to his employment as a commercial truck driver, which is the very occupation he utilized in furtherance of serious drug trafficking activity. As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the strong weight of the evidence against Defendant, his history and characteristics, the nature and seriousness of danger to the community posed by Defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure that Defendant will not engage in drug trafficking while on release pending trial or that he will appear as required.  Accordingly, detention must be ordered.

## IV.    <u>CONCLUSION</u>

Given the Court's finding that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community if he is released, the Court will lift its stay of the order of release entered by Magistrate Judge McAuliffe in the Eastern District of California on September 10, 2020, grant the Government's motion seeking revocation of the release order, revoke Defendant's bond and order that he shall be detained pending trial or other disposition of this matter.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: November 20, 2020

cc/ecf:  All counsel of record
         United States Marshal